IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 08-cv-02223-WJM-BNB

INGRID M.CARTINELLE, and
JOHN F. NOBLE,

Plaintiffs,

v.

JANET NAPOLITANO, Secretary, Department of Homeland Security,

Defendant.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

_____

This matter arises on the **Defendant's Motion for Summary Judgment** [Doc. # 64, filed 09/15/2010] (the "Motion").  I respectfully RECOMMEND that the Motion be GRANTED.

## I.  STANDARD OF REVIEW

In ruling on a motion for summary judgment, the facts must be viewed in the light most favorable to the party opposing the motion and that party must be afforded the benefit of all reasonable inferences to be drawn from the evidence.  Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970).  Rule 56(c), Fed.R.Civ.P., provides that summary judgment should be rendered "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, discovery and disclosure materials on file, and any affidavits, the absence of genuine issues of material fact. Celotex Corp. v. Catrett, 447 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 979 (10th Cir. 2002).

The party opposing the motion is then required to go beyond the pleadings and designate evidence of specific facts showing that there is a genuine issue for trial. Celotex, 447 U.S. at 324. Only admissible evidence may be considered when ruling on a motion for summary judgment. World of Sleep, Inc. v. La-Z-Boy Chair Co., 756 F.2d 1467, 1474 (10th Cir. 1985).

## II.  UNDISPUTED MATERIAL FACTS

The plaintiffs summarily state that they "do not agree with the Defendant's listing of undisputed material facts." *Memorandum Brief in Response and Opposition to Motion of Defendant for Summary Judgment . . . .* [Doc. #69] (the "Response"), p. 3. The plaintiffs list their own "Undisputed Material Facts." In addition, the plaintiffs introduce additional facts in the text of the Response. Many of the plaintiffs' facts are stated without any citation to supporting evidence; with citations that do not support the factual statements; or with citations to multi-page documents but not to the specific page number(s) of the documents.[1]

---

[1]The plaintiffs are not proceeding *pro se*. Therefore, their pleadings are not liberally construed. See Haines v. Kerner, 404 U.S. 519, 520-21 (1972).

The party opposing summary judgment "may not rely merely on allegations or denials in its own pleading; rather, its response must--by affidavits or as otherwise provided in this rule-- set out specific facts showing a genuine issue for trial."  Fed.R.Civ.P. 56(e)(2) (effective until December 1, 2010).  To create a genuine factual dispute, the plaintiff must provide evidence of specific facts showing that there is a genuine issue for trial.  Moreover, "[e]very citation in a motion , response or reply shall include the specific page . . . to which reference is made."  D.C.COLO.LCivR 7.1D.  It is not a judicial function to search the plaintiffs' 476 pages of exhibits for evidence supporting a particular fact.  See Gross v. Burggraf Construction Co., 53 F.3d 1531, 1546 (10th Cir. 1995).  It is the litigants' responsibility to provide concise arguments, relevant facts, and specific citations to authorities and supporting evidence.  Toth v. Gates Rubber Co., 2000 WL 796068, *8 (10th Cir. 2000).[2]

The following facts are undisputed:

1.   Plaintiff Ingrid Cartinelle was employed by the Transportation Security Administration ("TSA") from approximately September 2002 until June 2007 as a Screening Manager.  *Motion*, p. 2, ¶ 1 and Ex. A-1, 18:6-9; *Response*, p. 3, ¶ 1.

2.   Ms. Cartinelle first contacted an Equal Employment Opportunity ("EEO")  counselor on August 12, 2005, alleging a hostile work environment based on gender and on reprisal for

---

[2]The plaintiffs filed their Response on October 7, 2010.  On October 8, 2010, the plaintiffs filed a motion [Doc. #71] acknowledging that the Response exceeds the 20 page limit and "does not contain the certification that states that it complies with the REB Civ. Practice Standard V.1.4."  The plaintiffs requested "leave to re-file the brief so that it complies or for leave to file excessive pages."  On October 13, 2010, I granted the motion and accepted the Response as filed [Doc. #73].  My acceptance of the brief, however, in no way excused the plaintiffs from complying with the Federal Rules of Civil Procedure, the local rules of this court, and pertinent case law regarding their burden on summary judgment.

serving as a witness in a prior EEO complaint on June 7, 2005.  Her complaint alleged that she

found a dead rat in her office cubicle on July 7, 2005.  *Motion*, p. 2, ¶ 2 and Exs. A-2 and A-3;

*Response*, p. 3.  She alleged that her environment became hostile after she did not receive a

customer service manager position that was promised to her by Messrs. Austin and Meyer.

*Motion*, Ex. A-2, § C.  She stated that a customer service promotion in May 2004 was given to a

man who had never worked in that position; and a stakeholder position in August 2004, a

screening manager position in October 2004, and two duty manager positions in February 2005

were all given to men and a female retired from the military.  Id.

    3.   Ms. Cartinelle, through counsel, filed a formal complaint of discrimination on

January 30, 2006.  The complaint alleged a hostile work environment based on (1) sexual

harassment, (2) reprisal for serving as a witness in a complaint made by a co-worker, (3)

disability (Post Traumatic Stress Disorder), and (4) age.   *Motion*, p. 2, ¶ 3 and Exs. A-4 and A-

5; *Response*, p. 3, ¶ 3.

    4.   On August 24, 2006, the agency accepted for investigation Ms. Cartinelle's claim for

sex, age, and disability discrimination, and reprisal based on 14 incidents which she claimed

constituted a hostile work environment.  The agency dismissed the plaintiff's remaining

allegations for failure to exhaust administrative remedies and for failure to state a claim.  *Motion*,

p. 2, ¶ 4 and Ex. A-6; *Response*, p. 3, ¶ 4.

    5.   In June 2007, after finding a note on her computer board that stated she was a dog

and would never get a promotion, Ms. Cartinelle left TSA.  *Response*, p. 3, ¶ 5 and Ex. A-1,

13:9-13.

6.   On July 22, 2008, the Equal Employment Opportunity Commission ("EEOC") granted summary judgment in favor of the agency.  *Motion*, p. 2, ¶ 5 and Ex. A-7; *Response*, p. 4, ¶ 6.  The EEOC noted that Ms. Cartinelle had voluntarily withdrawn age and disability as bases for her hostile environment claim.  *Motion*, Ex. A-7, p. 4, n. 1.

12.   On July 31, 2008, the Department of Homeland Security (the parent agency to the TSA) issued its final decision which adopted the EEOC decision and dismissed the complaint. *Motion*, p. 3, ¶ 6 and Ex. A-8; *Response*, p. 4, ¶ 7.

13.   Plaintiff John Noble was employed by the TSA as a Lead Transportation Security Officer from September 2002 until he was fired on December 8, 2008.  *Motion*, p. 4, ¶ 1 and Ex. A-9, 11:16-17; 12:18-25; *Complaint*, ¶ 16p; *Response*, p. 4, ¶ 8.

Claim One alleges that the defendant violated Title VII.  Claim Two alleges that the defendant committed various state law torts.  The state law tort claims have been dismissed [Doc. #94].[3]

### III.   ANALYSIS

### A.   Ms. Cartinelle

### 1.   Exhaustion

The defendant asserts that "[a] plaintiff must contact an EEO counselor within 45 days of learning of the action alleged to be discriminatory" and that exhaustion of this administrative remedy "is a jurisdictional prerequisite to suit under Title VII . . . ." *Motion*, p. 6.  The defendant further asserts that Ms. Cartinelle has not exhausted her administrative remedies as to certain

---

[3]In addition, all claims brought by plaintiffs Pamela Helsper and Dwain Brown have been dismissed [Docs. #53 and #94].

alleged acts of discrimination that occurred 45 days prior to her first contact with an EEO counselor on August 12 2005.  Id. at p. 6.

Pursuant to statutory authority, the EEOC issued rules and regulations implementing the provisions of Title VII.  42 U.S.C. § 2000e-16(b).  The exhaustion requirements for claims of discrimination under Title VII are specified in 29 C.F.R. § 1614.101 et seq.  29 C.F.R. § 1614.103.  "The twofold purpose of the exhaustion requirement is to give notice of an alleged violation to the charged party and to give the administrative agency an opportunity to conciliate the claims in furtherance of Title VII's goal of securing voluntary compliance."  Woodman v. Runyon, 132 F.3d 1330, 1342 (10th Cir.1997).

The regulations require that a federal employee pursue informal and formal resolution. Id. at §§ 1614.105, 1614.106.  Prior to filing a complaint, the employee must first try to informally resolve the matter by consulting an EEO counselor within 45 days of the alleged discriminatory act.  Id. at § 1614.105(a).  If the matter is not resolved, the counselor must inform the employee of his right to file a discrimination complaint.  Id. at § 1614.105(d).  A complaint must be filed within 15 days after this notice.  Id. at § 1614.106(b).  The employee has the right to appeal the final action on, or the dismissal of, the complaint.  Id. at § 1614.106(e)(1).

The agency or the Commission shall extend the 45 day limit under the following circumstances:

> when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them, that he or she did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred, that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits, or for other reasons considered sufficient by the agency or the Commission.

Id. at §1614.105(a)(2).

Because the regulation vests the agency and the Commission with the discretion to extend the 45 day time limit, the Tenth Circuit Court of Appeals has held that a complainant's failure to *timely* file an administrative charge within the 45 day time limit is not a jurisdictional bar to filing suit. Sizova v. National Institute of Standards & Technology, 282 F.3d 1320, 1325 (10th Cir. 2002). Instead, the 45 day time limit may be tolled under appropriate circumstances. Id. However, a complainant's failure to file an administrative charge *at all* is a jurisdictional bar to suit. Id.

Here, it is undisputed that Ms. Cartinelle contacted an EEO counselor on August 12, 2005. With perhaps one exception, the bases for her hostile environment claim in this action are the incidents that "are restated in the Agency Decision document."[4] *Response*, pp. 6, 8. Therefore, the defendant's argument goes to the timeliness of Ms. Cartinelle's filing, not a complete failure to file, and the issue is one of tolling, not jurisdiction.

In a gender or race discrimination claim or a retaliation claim, "[e]ach discrete incident of [discriminatory] treatment constitutes its own unlawful employment practice for which administrative remedies must be exhausted." Martinez v. Potter, 347 F.3d 1208, 1210 (10th Cir. 2003). "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act." National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002). "The existence of past acts and the employee's prior knowledge of their

---

[4]Ms. Cartinelle also states that bases for her hostile environment claim are detailed in her deposition. *Response*, p. 6. However, she does not provide any specific citation(s) to the 154 page deposition. Therefore, I have not referred to her deposition to define her claims.

occurrence, however, does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed.  Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim."  Id.  The holding in Morgan "abrogate[d] the continuing violation doctrine as previously applied to claims of discriminatory or retaliatory actions by employers . . . ."  Martinez, 347 F.3d at 1210.

Ms. Cartinelle brings only a claim for hostile work environment.  "Hostile environment claims are different in kind from discrete acts."  Morgan, 536 U.S. at 115.  Because the very nature of a hostile environment claim involves repeated conduct, "[t]he 'unlawful employment practice' therefore cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.  Such claims are based on the cumulative effect of individual acts."  Id. (citations omitted).  In order for a charge to be timely, the employee need only comply with time constraints as to any one act that is a part of the hostile work environment.  Id. at 118. Therefore, "[p]rovided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  Id. at 117.

As discussed below, at least one incident contributing to Ms. Cartinelle's hostile environment claim occurred within the filing period.  Therefore, I will consider all of her alleged incidents of hostile environment.

## 2. Hostile Environment

The Complaint alleges that Ms. Cartinelle suffered sexual harassment resulting in a hostile environment.[5] *Amended Complaint* [Doc. #21] (the "Complaint"), p. 4, ¶ 14. "To establish [that] a sexually hostile work environment existed, a plaintiff must prove the following elements: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." Harsco Corp. v. Renner, 475 F.3d 1179, 1186 (10th Cir. 2007) (internal quotation and citation omitted). The defendant asserts that Ms. Cartinelle cannot establish that she was subjected to severe and pervasive sexual harassment that affected her job performance. *Motion*, p. 15.

Ms. Cartinelle states that the following incidents constituted a hostile environment:

(1)   On November 8, 2002, management referred to Ms. Cartinelle as a "broad" and directed her not to speak at a managers meeting;

(2)   On June 1, 2004, male screening managers held a meeting and Ms. Cartinelle was not allowed to attend the meeting;

(3)   On September 22, 2004, Ms. Cartinelle was not allowed to take a break from her shift because the duty manager was reading a book;

(4)   On December 12, 2004, when Ms. Cartinelle met with management to sign her evaluation, management told her she was a "second class citizen";

_____

[5] In her Response, Ms. Cartinelle attempts to assert a claim for hostile work environment based on reprisal. *Response*, pp. 13-14. This claim is not asserted in the Complaint, and I will not address claims raised for the first time in a brief opposing a dispositive motion.

(5)   On February 1, 2005, Ms. Cartinelle was not selected for duty manager positions, and management told her that she would never hold those positions;

(6)   On or about March 2005, for approximately one month, when Ms. Cartinelle walked by managers carrying food, the managers would kick the door shut in front of her;

(7)   On March 15, 2005, Ms. Cartinelle overheard male managers say that "they were trying to get rid of her";

(8)   On June 29, 2005, a co-worker told Ms. Cartinelle that he was "horny and [asked] if she could do anything about it";

(9)   On July 7, 2005, a dead rat was placed in Ms. Cartinelle's filing cabinet;

(10)   In July 2005, management refused to accommodate Ms. Cartinelle's fear of rats;

(11)   On December 1, 2005, Ms. Cartinelle was screened eight times to get through to checkpoints;

(12)   On December 1, 2005, Ms. Cartinelle was removed from the Bypass Security List;

(13)   On November 30, 2005, management informed Ms. Cartinelle that she had to obtain a duty evaluation from a psychiatrist internist;

(14)   Ms. Cartinelle's supervisor refused to respond to her emails and telephone calls regarding questions she had about the performance of her duties;

(15)   On August 9, 2006, Ms. Cartinelle's supervisor asked her to provide a statement regarding the character letter she wrote for another employee.  In an aggressive and harassing manner, her supervisor proceeded to place his body and face in close proximity to her personal space;

10

(16)   On August 9, 2005, Ms. Cartinelle's supervisor cancelled all of her scheduled overtime;

(17)   On September 22, 2006, Ms. Cartinelle's  supervisor directed her to transport another employee from the hospital to the employee parking lot;

(18)   On September 26, 2006, Ms. Cartinelle's  supervisor placed her on a three week suspension;

(19)   On October 20, 2006, Ms. Cartinelle's  automobile was vandalized in the parking garage at Denver International Airport;

(20)   On November 20, 2006, Ms. Cartinelle was assaulted in a stairwell at Denver International Airport;

(21)   In May 2007, an anonymous note was left on Ms. Cartinelle's keyboard stating that she was a dog; she would always be a dog; and she would never be promoted.[6]

*Response*, pp. 6-8.

Ms. Cartinelle fails to cite any evidence in the record further describing these incidents. This failure is fatal to her claim.

Ms. Cartinelle states that on November 8, 2002, management inappropriately referred to her as a "broad" and directed her not to speak at a manager's meeting.  She does not cite to any evidence regarding who called her a broad, *i.e.*, whether it was a man or a women; who directed her not to speak, *i.e.*, whether it was the same person; or in what context these words were

---

[6]This incident was apparently not presented to the EEOC.  *Response* p. 8.  Nevertheless, I include it in Ms. Cartinelle's list of discriminatory incidents because its inclusion is not material to my analysis of her claim.

spoken.  Consequently, I cannot conclude that Ms. Cartinelle was the subject of sexual harassment at the November 8, 2002, meeting.

The next incident of hostile treatment occurred more than eighteen months later, when Ms. Cartinelle states that male screening managers held a meeting which she was not allowed to attend.  Because she does not cite to any evidence regarding the purpose of the meeting; why she was not permitted to attend; or who decided she could not attend, I cannot conclude that she was subjected to sexual harassment when she was not permitted to attend the meeting.

Similarly, the plaintiff states that when she met with management to sign her evaluation on December 12, 2004, she was told she was a "second class citizen."  She does not cite to any evidence regarding the context of the statement or who made the statement.  She states that on February 1, 2005, she was not selected for duty manager positions, and management told her she would never hold those positions, but she does not cite to any evidence regarding these decisions.  Importantly, she does not cite to any evidence to show that her gender was implicated in these decisions.

Although Ms. Cartinelle alleges that on June 29, 2005, a co-worker told her that he was "horny and [asked] if she could do anything about it," she does cite to any evidence regarding the identity of the co-worker; whether she reported the incident; or to whom.  The plaintiff also states that Duty Manager Joseph Kautzman "sexually harassed" her on or about June 26, 2005, but she does not provide a citation to the record to support this statement.  *Response*, p. 8.  It appears from the EEOC decision (previously cited by the plaintiff) that Kautzman is the same individual who told Ms. Cartinelle on June 29, 2005, that he was "horny and [asked] if she could do anything about it," and that he sexually harassed her by pulling on her camisole.  *Motion*, Ex.

12

A-7, p. 6 (as assigned by the court's docketing system), ¶ 7.  Yet, Ms. Cartinelle states--without any citation to supporting evidence--that Security Manager Mark Wright is the individual who told her he was "horny and [asked] if she could do anything about it."  *Response*, p. 11.  The plaintiff cannot establish sexual harassment without supporting evidence, and she certainly cannot establish it with conflicting evidence.[7]

Ms. Cartinelle attempts to bolster her claim by stating that her supervisor, Richard Myers, admitted that she suffered a hostile work environment.  *Response*, p. 8.  She cites to Exhibit 11 in support of this statement.  Although Exhibit 11 is 9 pages long, Ms. Cartinelle does not provide a page number.  Nevertheless, I reviewed the exhibit and found that when Mr. Meyers was specifically asked if Ms. Cartinelle had been subjected to a hostile work environment, he responded "[n]ot to my knowledge or understanding."  Id. at Ex. 11, p. 3, ¶ 12.  Contrary to Ms. Cartinelle's assertion, Mr. Meyers did not admit that Ms. Cartinelle suffered a hostile work environment.

Ms. Cartinelle also attempts to bolster her claim by arguing that the rat incident was not properly investigated.  Specifically, she states that Susan Heidrick was assigned to investigate the rat incident, and the statements she collected

> indicate that the investigation was conducted by having everyone[]
> who signed in on July 6, 2007 to the "DIA Space B" where
> Plaintiff Cartinelle worked, give "a statement basically saying you
> saw nothing suspicious on those dates, and that you have no
> knowledge of the incident. (Unless you heard or saw something) ...
> it can be short... just email it to me when you get a chance."

---

[7]Ms. Cartinelle also claims that an inadequate investigation of this event demonstrates sexual harassment, but she does not provide any evidence regarding who conducted the investigation or that its inadequacy, if any, is related to her gender.

*Response*, p. 9.

Ms. Cartinelle grossly mischaracterizes the supporting evidence to which she cites. She cites to Exhibit 26 which is an email correspondence between Ms. Heidrick and an employee, Bernard Celestin.[8]  The email reflects the following exchange:[9]

> Bernard, this is Susie from regulatory.  I left a message with Connie Lemcke last night to let you know that I need a statement from you regarding the Ingrid Cartinelle rat incident that occurred 07/6-07/7.  You showed to have gained access to the B space within the time frame the incident occurred.  (Along with many others).  Anyway, all I need is a typed statement from you containing any info you may have or not have regarding the incident.  I will be out of the office until Monday, but if you could just put your statement in the Regulatory box in the A space and seal it in an envelope, it would be much appreciated!  Thanks, and I hope all is well with you.  –Susie.
>
> Hi Susie,
> Please forgive me for not responding quicker, I am on vacation the week 7-31-05 through 8-05-05.  I have RDO's on friday and saturday so I was not here when this incident occured, I came in the "B" space at about 2000hrs on sunday 7-10-2005. Respectfully, Bernard Celestin
>
> Hi Bernard, sorry to bug you on vacation!!!!  Actually, the incident occurred between 5pm on 07/06/2005 and 7 am on 07/07/05 (Thursday night you badged in at 2:04 am to the B space.)....I just need *a statement basically saying you saw nothing suspicious on those dates, and that you have no knowledge of the incident. (unless you heard or saw something)...it can be short...just e-mail it to me when you get a chance*????  And enjoy vacation!!!  Sorry I didn't know you were on a vacation.  Thanks a lot!  Susie

---

[8]  Ms. Cartinelle also cites to Exhibit 3 which is a two page document that appears to list the names of employees who attempted to access "DIA Space B" from 5:06 p.m. on July 6, 2005, through 7:29 a.m. on July 7, 2005.  There is no affidavit to authenticate or explain the document, and the significance of the document is unclear.

[9]I have quoted the emails as written, without correction or acknowledgment of error.

> Hi Susie,
> I am in the office almost everynight due to the fact that I pick up
> the surrendered items, on the night that you are reffering to I did
> not see or hear anything out of the norn when I was in there.
> Respectfully, Bernard Celestin

*Response*, Ex. 26 (emphasis added).

Taken in its proper context, Ms. Heidrick's email does not "indicate that the investigation was conducted by having everyone""give a statement basically saying you saw nothing suspicious on those dates and that you have no knowledge of the incident."  To the contrary, Ms. Heidrick initially requested a statement from Mr. Celestin containing *any* information he possessed regarding the incident.  Ms. Heidrick asked Mr. Celestin to provide a "statement basically saying you saw nothing suspicious on those dates, and that you have no knowledge of the incident. (unless you heard or saw something)" *after* he informed her that he was not present when the incident occurred.

Ms. Cartinelle's remaining challenges to this investigation are either not substantiated with citations to supporting evidence and/or they fail to show that Ms. Cartinelle was subject to severe and pervasive harassment due to her gender.  Indeed, the criticized investigation was conducted by Ms. Heidrick--a female.

At the summary judgment stage, the plaintiff must provide evidence of specific facts showing that there is a genuine issue for trial.  Considering the totality of circumstances alleged by Ms. Cartinelle, I find that she has failed to create a material factual dispute regarding whether she was subjected to severe and pervasive harassment based on her gender.  "If the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment."  <u>Stahl v. Sun Microsystems, Inc.</u>,

19 F.3d 533, 538 (10th Cir. 1994).  I recommend that the Motion be granted insofar as it seeks summary judgment in favor of the defendant on Ms. Cartinelle's allegations of a hostile work environment.

### B.  Mr. Noble

### 1.  Exhaustion

The defendant states that "[f]or the reasons set forth in [M. Bradley] Flynn's Declaration, Noble has not exhausted his administrative remedies for the allegations contained in paragraphs 16(a), 16(d), 16(e), 16(g), 16(i), 16(j), 16(k), 16(l), 16(m), 16(n), and 16(o)." *Motion*, p 7, ¶ b.

Mr. Noble states that he "has fully exhausted his administrative remedies by the filing of Complaints with the EEO office of the TSA for acts of discrimination, hostile work environment and retaliation since December, 2003." *Response*, p. 16, ¶ B.  Mr. Noble cites to plaintiffs' Exhibit 46 to support his assertion that he has fully exhausted his administrative remedies.  Id. and p. 4, ¶¶ 11-12.  However, Exhibit 46 establishes only that he received a right to sue letter in Agency Case No. HS-06-TSA-001563, which (as discussed below) is one of four EEOC complaints he filed.  Mr. Noble also states that the "memos and letters to management at TSA, included in Exhibit 47, further demonstrate that Plaintiff Noble was attempting to take all of the required steps to properly file and complete his EEO charges." Id. at p. 16, § B.  Mr. Noble does not cite to any specific page number(s) of Exhibit 47, which is 93 pages in length. I decline to search through it for evidence to support Mr. Noble's "attempts" at exhaustion.

The defendant provides undisputed evidence which establishes that Mr. Noble filed complaints of discrimination with the EEOC on four occasions:

1. Mr. Noble first contacted an EEO Counselor on January 20, 2004 (Agency Case No. HS-04-TSA-000849). *Motion*, Ex. A-15, ¶ 5; Attachment A (Doc. #64-16);[10] Attachment B (Doc. #64-17), p. 2. See also *Response*, Ex. 23, p. 2. When counseling did not resolve his complaint, he filed a formal complaint of discrimination on March 2, 2004. Id. The issue investigated was "[w]hether based on race (African-American), [he] was discriminated against. . . when he was subjected to a hostile work environment culminating in late December 2003, and reassigned to another work area, 1 West CTX on December 24, 2003." Id. at Ex. A-15, ¶ 5 and Attachment B (Doc. #64-17); *Response*, Ex. 23. The harassing incidents cited by Mr. Noble were: (a) upon transfer from Concourse B, Makeup 1 to Concourse B, Makeup 3 on December 18, 2003, Mr. Noble was unreasonably instructed to sign in by Supervisor George Root; (b) Root spoke to Noble in a threatening manner; (c) Noble was later transferred to the East Terminal, and Root and Supervisor Paula Landsberger visited the area almost every day for a couple of months to inquire about Noble's whereabouts; (d) on May 18, 2004, Landsberger marked Noble AWOL and No Call/No Show when he was late, but he had telephoned management about his whereabouts; and (e) when Noble reported for overtime, Landsberger informed him he was not needed for work. Id.

---

[10]The attachments to Mr. Flynn's declaration do not contain labels. They are labeled only in the court's electronic docketing system where they have been entered into the system as Exhibits A through I. The docketing system has assigned them document numbers 64-16 through 64-24, respectively. To avoid confusion, I refer to them as both Attachments A through I and Docs. #64-16 through 64-24.

None of these incidents are alleged in the Complaint.  However, Mr. Noble refers to them in his Response.[11]  *Response*, p. 16.  Therefore, I assume he intends to include these incidents in his claims of discrimination, and I will determine if they are properly exhausted.

An employee may file a civil action under the following circumstances:

> A complainant who has filed an individual complaint . . . is authorized under Title VII, the ADEA and the Rehabilitation Act to file a civil action in an appropriate United States District Court:
>
> (a) Within 90 days of receipt of the final action on an individual or class complaint if no appeal has been filed;
>
> (b) After 180 days from the date of filing an individual or class complaint if an appeal has not been filed and final action has not been taken;
>
> (c) Within 90 days of receipt of the Commission's final decision on an appeal; or
>
> (d) After 180 days from the date of filing an appeal with the Commission if there has been no final decision by the Commission.

29 C.F.R. § 1614.407.

There is no evidence in the record showing that Mr. Noble received a notice of final action from the agency on this complaint of discrimination or that he filed an appeal with the EEOC.  To the contrary, Mr. Noble erroneously claims that Exhibit 46 is evidence of a final decision on these allegations.  *Response*, p. 4, ¶¶ 11-12; p. 16, ¶ B.  The record shows only that these allegations were investigated.

---

[11]In the Complaint, Mr. Noble lists alleged discriminatory acts by supervisors and managers, but states that the alleged acts are not all-inclusive.  *Complaint*, ¶ 16.  The plaintiff does not provide, or cite to, a complete list of the discriminatory actions on which he bases his claims.  Therefore, I look to the allegations provided in his EEOC complaints and the allegations contained in the Complaint.

Where no final EEOC decision is reached, the plaintiff may file suit at anytime beyond 180 days after filing his complaint of discrimination.  There is no limitation as to when the suit must be commenced.  <u>EEOC v. W. H. Braum, Inc.</u>, 347 F.3d 1192 (10th Cir. 2003).  Therefore, these claims have been exhausted, and they are timely filed.

2.  Mr. Noble contacted an EEO Counselor again on October 24, 2005 (Agency Case No. HS-06-TSA-001563).  *Motion*, Ex. A-15, ¶ 6; Attachment C (Doc. #64-18); and Attachment D (Doc. #64-19), p. 2.  He filed a formal complaint of discrimination on or about March 28, 2006.  <u>Id.</u>  In his complaint, he claimed that he was subjected to a hostile work environment based on his race and in retaliation for his prior EEO activity when (a) in July 2005, management did not allow him to facilitate training; (b) in July 2005, management placed him on a Leave Restriction Plan; (c) in October 2005, his supervisor denied his request to reduce his hours in the Explosive Detection System room and instead increased his hours; (d) in October 2005, management suspended him for three days; and (e) in December 2006, management suspended him for seven days for allegedly violating the Leave Restriction Plan.  <u>Id.</u> at Ex. A-15, ¶ 6 and Attachment D (Doc. #64-19).  On July 19, 2010, after Mr. Noble filed his claims in this action,[12] the Department of Homeland Security issued a final decision dismissing all of the claims with a finding of no discrimination.  <u>Id.</u> at Ex. A-15, ¶ 7 and Attachment E (Doc. #64-20); *Response*, Ex. 46.

---

[12]This case was initiated by Pamela Helsper, who was proceeding *pro se* when she filed her initial Complaint [Doc. #1].  That Complaint was amended by counsel on December 4, 2009, to add the claims of Mr. Noble and others [Doc. #20].

Although the agency issued its final decision after Mr. Noble filed his claims, those claims were brought here more than 180 days after he filed his agency action.  Therefore, the court has jurisdiction to hear these claims:

> The EEOC has exclusive jurisdiction over a claim during the 180 days following the filing of a charge with the EEOC by an aggrieved individual.  Waffle House, 534 U.S. at 291, 122 S.Ct. 754.  During this time an individual employee may not bring suit in federal court.  Courts have held that where an aggrieved employee files suit after the expiration of the 180 days, however, jurisdiction over his or her claim exists, even if a right-to-sue letter was not actually received.  See Perdue v. Roy Stone Transfer Corp., 690 F.2d 1091, 1093 (4th Cir.1982).  The Perdue court held jurisdiction arises at this time in order to protect the employee: "The Commission's failure actually to issue the notice cannot defeat the claimant's statutory right to sue in the district court, for '[a] Title VII claimant is not charged with the commission's failure to perform its statutory duties.' " Id. (quoting Russell v. Am. Tobacco Co., 528 F.2d 357, 365 (4th Cir.1975))(alteration in original).

Braum, 347 F.3d at 1200-01.

Incidents (a) through (d) are included in paragraphs 16(b), 16(c), 16(f), and 16(h) of the Complaint.  Incident (e) is not included in the Complaint, but is referred to in Mr. Noble's Response to the Motion.  *Response*, p. 16.  Therefore, I assume Mr. Noble intends to include all of these incidents in his claims of discrimination.

3.  Mr. Noble contacted an EEO Counselor for the third time on January 9, 2008 (Agency Case No. HS-08-TSA-005640).  *Motion*, Ex. A-15, ¶ 9 and Attachment F (Doc. #64-21).  He filed his third formal complaint of discrimination on May 22, 2008.  Id.  Mr. Noble claimed that he was subjected to a hostile work environment based on his race and in retaliation for his prior EEO activity when: (a) on January 7, 2008, he was reassigned to a different work station; (b) in January 2008, he submitted verbal and written inquiries to his supervisor asking

why he had been transferred, but did not receive an answer; (c) on January 9, 2008, he was accused of government documentation fraud and informed he was under investigation for falsifying time cards; (d) on January 10, 2008, he was placed on leave restriction for six months by supervisor Ryan Matthew Davis; (e) for two or three weeks after he was placed on leave restriction, Haymond Foreman, Sam Thompson, and Donna Oaks waited at his work station each morning to monitor his arrival; (f) on an unspecified date in 2008, he was charged with 2.5 hours AWOL; (g) on June 20, 2008, his supervisor, Tom Brown, claimed he had been away from his duty station and forced him to take 15 minutes of leave time; and (h) on June 27, 2008, he was moved from his assigned duty area.  Id. at Ex. A-15, ¶ 9 and Attachment G (Doc. #64-22); *Response*, Ex. 25.

The defendant provides evidence that the Department of Homeland Security has not issued a final decision on Mr. Noble's third EEO complaint, *Motion*, Ex. A-15, ¶ 10, and the record does not contain any evidence to the contrary.  Mr. Noble filed this action on December 4, 2009, more than 180 days after he filed his agency charge of discrimination on May 22, 2008. Therefore, the court has jurisdiction to hear these claims.

Incidents (c) and (f) are arguably asserted in the Complaint.  *Complaint*, ¶¶ 16(l) and (o). The remaining incidents are addressed in the Response.  *Response*, pp. 17-20.  Therefore, I will include all of these incidents in my analysis of Mr. Noble's claims of discrimination.

4.  Mr. Noble contacted an EEO Counselor for the fourth time on December 17, 2008 (Agency Case No. HS-09-TSA-003076).  *Motion*, Ex. A-15, ¶ 11 and Attachment H (Doc. #64-23).  He filed his fourth formal complaint of discrimination on April 10, 2009.  Id.  Mr. Noble claimed he was subjected to race discrimination and retaliation for his prior EEO activity when

on December 4, 2008, he was terminated from his position as Lead Transportation Security

Officer.[13] Id. at Ex. A-15, ¶ 12 and Attachment I (Doc. #64-24).

Paragraph 16(p) of the Complaint incorporates this claim.  The record does not reflect

that any final decision was reached.  Mr. Noble filed this action on December 4, 2009, more than

180 days after he filed his agency charge of discrimination on April 10, 2009.  Therefore, the

court has jurisdiction to hear the claim.

The defendant asserts that Mr. Noble did not exhaust the allegations contained in

paragraphs 16(a), 16(d), 16(e), 16(g), 16(i), 16(j), 16(k), 16(l), 16(m), 16(n), and 16(o) of the

Complaint. *Motion*, p. 7.

Paragraph 16(a) of the Complaint alleges that after filing his first charge of

discrimination in January 2004, Mr. Noble was retaliated against for the next four years.  This

allegation is too vague and conclusory to provide a basis for a discrimination claim of any kind.

I consider this allegation only to the extent it states that Mr. Noble is asserting a cause of action

for retaliation.

Similarly, paragraph 16(i) alleges that Mr. Noble suffered continued workplace

harassment during the remainder of 2008 which he reported, but the harassment continued.  This

allegation is too vague and conclusory to provide a basis for a discrimination claim of any kind.

I consider this allegation only to the extent it states that Mr. Noble is asserting a cause of action

for racial harassment resulting in a hostile work environment.

---

[13]Mr. Flynn attests that Mr. Noble asserted a claim for hostile environment based on race and retaliation, but his cited evidence states that Mr. Noble claimed he was subjected to race discrimination and retaliation.  The record does not reflect that Mr. Noble asserted a hostile environment claim in his fourth complaint of discrimination.

The defendant asserts that paragraphs 16(d), 16(e), 16(g), 16(j), 16(k), 16(l), 16(m), 16(n), and 16(o) are not exhausted because the allegations were "neither complained about nor investigated in any of Noble's four EEO complaints." *Motion*, pp. 7-10.

Paragraph 16(d) alleges that Mr. Noble "was required to ask permission to go to the bathroom and no other employees were required to seek such permission."

Paragraph 16(e) alleges that Mr. Noble was not allowed to report to Charles Bush, an African-American supervisor, but was required to report to Mark Schmidt and Mary Oliver, both of whom had previously discriminated against him.

Paragraph (g) alleges that Mr. Noble "was informed by Supervisor Ann Drain that 'management' had informed her that she was not to remove Plaintiff Noble from Leave Restriction regardless of any improvement in his falsely alleged 'attendance problem.'"

Paragraph (i) alleges that Mr. Noble was "given disparate treatment when he requested FMLA leave for a family funeral and when he suffered continued medical problems with migraine headaches . . . ."

Paragraph (j) alleges that in March 2007, Mr. Noble's supervisor, Dean Slack, advised him "that he was passed over for a promotion to BDO because of his use of FMLA" and others who were also on FMLA but were not African-American were offered the position."

Paragraph (k) alleges that on November 11, 2007, Supervisor Mary Oliver "falsified Plaintiff Noble's sign in sheet to indicate that he was 15 minutes late, when he was, in fact, on time."

"[W]hen an employee seeks judicial relief for incidents not listed in his original charge to the EEOC, the judicial complaint nevertheless may encompass any discrimination like or

reasonably related to the allegations of the EEOC charge" Martinez v. Potter, 347 F.3d 1208, 1211 (10th Cir. 2003) (quoting Ingels v. Thiokol Corp., 42 F.3d 616, 625 (10th Cir.1994)); Mitchell v City and County of Denver, 112 Fed.Appx. 662, 667 (10th Cir. 2004) (applying Martinez to hostile work environment claim). "A claim is considered reasonably related when the conduct complained of would fall within the scope of the administrative investigation which can reasonably be expected to grow out of the charge that was made. This more lenient pleading standard contemplates the fact that administrative charges of unlawful employment practices are regularly filled out by employees who do not have the benefit of counsel." Mitchell, 112 Fed. Appx. at 667 (internal quotations and citations omitted).

Here, I cannot conclude that paragraphs 16(d), 16(e), 16(g), and 16(i) are reasonably related to Mr. Noble's EEOC complaints of discrimination because Mr. Noble does not cite to any evidence regarding the dates of the alleged events; the names of the individuals responsible for the alleged actions; or any additional information concerning the alleged incidents.

Paragraph 16(j) alleges that in March 2007, Dean Slack advised Mr. Noble "that he was passed over for a promotion to BDO because of his use of FMLA." This allegation is not reasonably within the scope of any of the EEOC investigations. Mr. Noble's second complaint of discrimination encompassed actions from July 2005 through December 2006. *Motion*, Ex. A-15, Attachment D.[14] His third complaint of discrimination encompassed actions from January 2008 through June 2008. *Response*, Ex. 25. Therefore, the time frame of the failure to promote

---

[14]Mr. Noble does not attach a copy of the second investigative report to his Response; he attaches only a copy of the agency's final decision. *Response*, Ex. 46. The defendant does not attach a complete copy of the second investigative report to the Motion; she attaches only the first six pages of the report.

incident is not within the scope of the investigations of any of his formal complaints of discrimination. Moreover, the second investigative report does not allege failure to promote, and the third investigative report states only that Mr. Noble "stated that he feels that he should be promoted to supervisor with a promotion date of April 2004." *Response*, Ex. 25, p. 4.

In addition, Mr. Slack is not mentioned in the third investigative report and is mentioned only in passing in the second investigative report. Specifically, the second investigative report states:

> The Complainant explained that his supervisors (STSOs) during the timeframe of this complaint were mainly Mark Schmid and Dean Slack, but when Mr. Slack was transferred to the position of Operations Supervisor, he dealt mostly with Mr. Schmid. He recalled that in 2005, prior to his being notified he could no longer facilitate training, and prior to being placed on a LRP, he was notified by Mr. Schmid that he and Mr. Slack were having difficulty with one African-American (Juanita Ivory) and one Hispanic female (Angela Santora).

*Motion*, Ex. A-15, Attachment D, pp. 3-4. The investigator's description of Mr. Noble's complaints then centers on the actions of Mr. Schmid. Mr. Slack was not interviewed during either investigation. Based on the foregoing, I do not include the allegations of paragraph 16(j) in my analysis.

Paragraph 16(k) alleges that on November 11, 2007, Supervisor Mary Oliver "falsified Plaintiff Noble's sign in sheet to indicate that he was 15 minutes late, when he was, in fact, on time." As with the previous allegation, the time frame of this incident is not within the scope of the investigations of any of his formal complaints of discrimination. Therefore, I do not include it in my analysis.

In summary, my analysis of Mr. Noble's claims is based on the allegations contained in his four complaints of discrimination to the EEOC.

## 2.  Discrimination Claims

Mr. Noble does not state with clarity his claims, nor does he clearly identify the bases for his claims.  *Complaint* p. 9, ¶ 16.  The defendant has established, and Mr. Noble does not contest, that Mr. Noble's first EEO complaint alleged a hostile environment based on race; his second EEO complaint alleged a hostile environment based on race and retaliation for prior EEO activity; his third EEO complaint alleged a hostile environment based on race and retaliation for prior EEO activity; and his fourth EEO complaint alleged that he was terminated on the basis of his race and in retaliation for his prior EEO activity.  These are the causes of action that have been exhausted.  Mr. Noble's Response does not contain any argument or evidence to demonstrate that he is asserting any other claims. Therefore, these are the claims I address.

In order to maintain a claim for a racially hostile environment, the plaintiff must demonstrate that "under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus."  Bolden v. PRC, Inc., 43 F.3d 545, 551 (10th Cir. 1994) (internal quotations and citations omitted).  "General harassment if not racial . . . is not actionable."  Id.  "A retaliatory hostile work environment claim is analytically similar: a plaintiff must demonstrate that the alleged harassment stemmed from retaliatory animus."  Gorny v. Salazar, No. 10-8047, 2011 WL 596129 at *7 (10th Cir. February 22, 2011).

In evaluating whether an environment is hostile, I must look at all the circumstances including "the frequency of the discriminatory conduct, its severity, whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys. Inc., 510 U.S. 17, 23 (1993).  In addition, I must "consider the work atmosphere both objectively and subjectively, looking at all the circumstances from the perspective of a reasonable person in the plaintiff's position." Herrera v. Lufkin Industries, Inc., 474 F.3d 675, 680 (10th Cir. 2007) (internal quotations omitted).

"To prevail on a claim alleging termination on the basis of race, [Mr. Noble] must first establish a prima facie case, demonstrating that: (1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination."  Salguero v. City Of Clovis, 366 F.3d 1168, 1175 (10th Cir. 2004).

To establish a prima facie case of retaliation, Mr. Noble must prove "(1) [he] engaged in a protected opposition to discrimination or participation in a proceeding arising out of the discrimination, (2) adverse action by the employer subsequent to the protected activity, and (3) a causal connection between the employee's activity and the adverse action."  Griffith v. State of Colo., Div. of Youth Services, 17 F.3d 1323, 1331 (10th Cir. 1994).  "A causal connection is established where the plaintiff presents evidence sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action."  Corneveaux v. CUNA Mut. Ins. Group, 76 F.3d 1498, 1507 (10th Cir. 1996) (internal quotations and citation omitted).

In Noble's first complaint to the agency, he alleged a hostile work environment based on race.  Specifically, he alleged: (a) upon transfer from Concourse B, Makeup 1 to Concourse B, Makeup 3 on December 18, 2003, Mr. Noble was unreasonably instructed to sign in by

Supervisor George Root; (b) Root spoke to Noble in a threatening manner; (c) Noble was later transferred to the East Terminal, and Root and Supervisor Paula Landsberger visited the area almost every day for a couple of months to inquire about Noble's whereabouts; (d) on May 18, 2004, Landsberger marked Noble AWOL and No Call/No Show when he was late, but he had telephoned management about his whereabouts; and (e) when Noble reported for overtime, Landsberger informed him he was not needed for work.

Alone, these allegations do not demonstrate a hostile work environment based on race. Mr. Noble states that the testimony provided by witnesses in their affidavits to the agency investigators support his claims of discrimination. *Response*, pp. 16-17. Mr. Noble further states that the investigation reports performed by the agency "summarize the facts that are set out in the affidavits." Id. at 23. To the extent Mr. Noble cites to specific evidence in support of specific factual statements, I will consider the evidence. However, I will not read all of the affidavits and all of the investigation reports in search of facts to support Mr. Noble's claims.

Mr. Noble cites to the affidavit of Kristin Slayton regarding the events of 2003. *Response*, p. 19. At the time of the events in question, Ms. Slayton was a Transportation Security Supervisor, and she reported to Carl Spurgeon and Mike Blea. Id. at Ex. 34, p. 1. Mr. Noble relies on several statements made by Ms. Slayton regarding what Mr. Root and Mr. Blea told her and what Paula Landsburger told Mr. Noble. *Response*, pp. 19-20. These statements are hearsay, and they are not competent evidence. Fed.R.Evid. 801 and 803. Therefore, I do not consider the statements in my analysis of the Motion. Thomas v. International Business Machines, 48 F.3d 478, 485 (10th Cir. 1995) (stating that "the nonmoving party need not produce evidence in a form that would be admissible at trial, but the content or substance of the evidence

28

must be admissible" and that hearsay testimony that would be inadmissible at trial may not be used to defeat summary judgment) (internal quotations and citations omitted).

Mr. Noble also relies on Ms. Slayton's testimony that Mr. Noble was reassigned; she believed that Mr. Meyers, the Assistant Federal Screening director, had approved Mr. Root's request to reassign Mr. Noble; she believed that Mr. Noble had been treated unfairly and discriminated against because of his race; Paula Landsburger sent Mr. Noble home on an unspecified date after he reported to work for overtime duty; and she believed that "if it were anyone other than Mr. Noble, they would not have been sent home." *Response*, pp. 19-20.

Although Ms. Slayton states that she believed Mr. Noble had suffered discrimination based on his race, she fails to provide any admissible explanation for her belief.[15]  Moreover, Mr. Noble does not cite to any evidence to show that he was treated differently than other employees because of his race; evidence of racial slurs or racially motivated comments; or evidence that Mr. Root's behavior was otherwise racially motivated.

A plaintiff claiming a hostile work environment "must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Davis v. U.S. Postal Service, 142 F.3d 1334, 1341 (10th Cir. 1998) (internal quotations and citations omitted).  Mr. Noble has failed to make such a showing with regard to the events complained of in his first EEO complaint of discrimination.

---

[15]The only plausible basis for her belief appears to be an inadmissible hearsay statement that Mr. Blea told her "Judith Singleton . . . instructed Mr. Root to observe Mr. Noble because he was a 'wanderer.'  Mr. Blea opined to me that Ms. Singleton's request to Mr. Root was racially motivated toward Mr. Noble." Id. at Ex. 34.

In his second complaint of discrimination, Mr. Noble claimed that he was subjected to a hostile work environment based on his race and in retaliation for his prior EEO activity when (a) in July 2005, management did not allow him to facilitate training; (b) in July 2005, management placed him on a Leave Restriction Plan; (c) in October 2005, his supervisor denied his request to reduce his hours in the Explosive Detection System room and instead increased his hours; (d) in October 2005, management suspended him for three days; and (e) in December 2006, management suspended him for seven days for allegedly violating the Leave Restriction Plan.

These events occurred more than one year after the events complained about in Mr. Noble's first complaint of discrimination. Mr. Noble does not cite to any evidence to show that these events are in any way related to the events listed in his first complaint of discrimination-- for example, that the same supervisors and/or managers were involved. Indeed, he does not cite to any evidence to show the identity of the individuals responsible for the actions. I decline to search the record for such evidence, and I view the actions alleged in Mr. Noble's second EEOC complaint as separate events, unrelated to the events alleged in his first EEOC complaint.

In support of the claims made in his second complaint of discrimination, Mr. Noble cites to the affidavit of Patti Zeller. *Response*, p. 20. At the time of Mr. Noble's complaint, Ms. Zeller was a Baggage Transportation Security Officer who worked under Mr. Noble in his position as Lead Transportation Security Officer. She states that she was in a position to observe the working relationship between Mr. Noble, Mr. Schmid, and Mr. Blea on a periodic basis; in her observation, it seemed like management was trying to gather information to build a case against Mr. Noble; she and the other employees were asked to write statements regarding Mr.

Noble and another Lead TSO; she does not feel that Mr. Noble's treatment was based on his race; and she is not sure why management seemed to be trying to discredit him. Id. at Ex. 33.

Mr. Noble also cites to the affidavit of Charles Bush, Supervisory Transportation Security Officer. *Response*, pp. 20-21; Ex. 36. Mr. Bush states that he was not aware that Mr. Noble had participated in protected EEO activity in the past. He further states:

> I have no first-hand information regarding the issues involved in this complaint. However, during the timeframe that I was Mr. Noble's direct supervisor in Baggage, an investigation was conducted into allegations made against Mr. Noble by a female Transportation Security Officer. Even though I was Mr. Noble's direct supervisor, and the supervisor of the female employee at the time, no management official informed me of the investigation. The fact that both Mr. Noble and I are African-American leads me to believe that my non-involvement was racially motivated. I myself have also had to file an EEO complaint based on unfavorable treatment that I believe is based on my race.

Id. at Ex. 36, ¶ 3.

Mr. Noble cites to two additional exhibits regarding the 2005 events. First, he cites to Exhibit 43, a letter dated September 11, 2005, and signed by 14 individuals including Mr. Noble. The letter states:

> We the screeners currently and/or previously assigned to 1 East, Level 3 believe that management has created a hostile work environment in our area. We have attempted to resolve several issues of conflict using techniques taught to us in the "I see me in the Solution" class currently being provided to us by TSA. We respectively request a meeting with Al Meyers and/or Bill Allen in an attempt to resolve this issue as soon as possible. If necessary, so that we can all attend, this meeting can be scheduled before or after our assigned shift.

The letter does not describe the nature of the "hostile work environment" or the "several issues of conflict," and Mr. Noble does not cite to any evidence which further describes the nature of these terms.

Next, Mr. Noble cites to Exhibit 44. *Response*, p. 23. Exhibit 44 is a memo addressed to Mark Schmid, Ann Drain, and Dean Slack from "1 east, level 3 screeners" and is dated August 17, 2005. The letter states:

> The screeners at 1 East, Level 3 would like to express our appreciation to John Noble for taking the initiative and providing us with an opportunity to attend OLC regularly. He does this fairly and on a regular basis so that all screeners in our area are meeting their required training.
>
> We are willing to testify that during the time that he has been responsible for us at OLC, he has not been absent for an extended period of time and has been available to help us when we have needed assistance.

Mr. Noble's cited evidence in support of the allegations made in his second EEO complaint does not show that he was subjected to a hostile work environment because of his race or that he was subjected to retaliation for previous EEO activity. Mr. Noble does not cite any evidence tending to show that any of the listed actions were racially motivated, nor does he cite any evidence demonstrating that the individuals responsible for the actions knew or should have known of his previous EEO activities. Indeed, he does not cite to any evidence to show the nature of his previous EEO activities or the identities of the individuals responsible for the alleged actions.

Mr. Noble's third complaint alleged that he was subjected to a hostile work environment based on his race and in retaliation for his prior EEO activity when (a) on January 7, 2008, he was reassigned to a different work station; (b) in January 2008, he submitted verbal and written

inquiries to his supervisor asking why he had been transferred, but did not receive an answer; (c) on January 9, 2008, he was accused of government documentation fraud and informed he was under investigation for falsifying time cards; (d) on January 10, 2008, he was placed on leave restriction for six months by supervisor Ryan Matthew Davis; (e) for two or three weeks after he was placed on leave restriction, Haymond Foreman, Sam Thompson, and Donna Oaks waited at his work station each morning to monitor his arrival; (f) on an unspecified date in 2008, he was charged with 2.5 hours AWOL; (g) on June 20, 2008, his supervisor, Tom Brown, claimed he had been away from his duty station and forced him to take 15 minutes of leave time; and (h) on June 27, 2008, he was moved from his assigned duty area.

The events alleged in Mr. Noble's third EEO complaint occurred more than one year after the events alleges in his second EEO complaint. Again, Mr. Noble does not cite to any evidence showing that the events are related. He does not cite to any evidence demonstrating that the actions occurred in the same area or were taken by the same individuals. Therefore, I view the events alleged in Mr. Noble's third EEO complaint as separate and unrelated to the events alleged in his second EEO complaint.

In support of these 2008 events, Mr. Noble cites to his deposition testimony and the affidavits of several individuals. The deposition testimony consists mostly of inadmissible hearsay. For example, Mr. Noble states (1) "[a]ccording to Joe Kautzman, at this same official meeting, as he called it, he said that Mr. Myers said that I was not to be promoted . . . ."; (2) "Ann Drain informed me . . . ."; (3) Howard McCartney informed me that he was told . . . ."; and (4) Larry Owens informed me that Judith Singleton came to him personally and told him . . . ."

*Response*, p. 17.  I cannot consider inadmissible hearsay in my analysis of the Motion.  <u>World of Sleep, Inc.</u>, 756 F.2d at 1474.

In the remaining deposition testimony cited by Mr. Noble, he states that management wanted to build a case against him; Al Myers refused to approve Mr. Noble for an employee recognition award; and Santos Savoia transferred the plaintiff to an area supervised by Matt Ryan from an area supervised by Howard McCartney because McCartney refused to put Mr. Noble on leave restriction.  *Response*, p. 17.

Mr. Noble cites to several affidavits regarding the events of 2008.  He states that Ryan Davis, Supervisor Transportation Security Officer, "admits in his affidavit that he was ordered to put Plaintiff on leave restriction by Santos Savoia, not because Plaintiff Noble deserved to be on leave restriction."  <u>Id.</u> at p. 18.  and Ex. 27, ¶ 1.  However, Mr. Davis did not state that Mr. Noble did not deserve to be on leave restriction; he stated that Mr. Noble "was put on leave restriction when he first came to my unit.  I was told to put him on leave restriction by TSM Tony Savoia." <u>Id.</u> at Ex. 27, ¶ 17.  Mr. Davis further stated that he was not aware that Mr. Noble had filed previous EEO complaints.  <u>Id.</u> at ¶ 22.

Mr. Noble cites to the affidavits of Haymond Foreman and Sam Thompson.  *Response*, p. 18.  Mr. Foreman was a Lead Transportation Security Officer at the time of the 2008 events. <u>Id.</u> at Ex. 28, ¶ 4.  His affidavit states:

> At one point in time I was given a notebook to keep records
> specifically on [Mr. Noble's] timeliness.  Matt Davis handed me
> the notebook but the orders came from higher up.  I do not know
> who gave the orders to Matt Davis.  However, I did not keep tract
> [sic] of [Mr. Noble's] timeliness and I did not turn in my green
> book.  I did not follow through with the instructions because I did
> not feel comfortable keeping track of [Mr. Noble] due to my
> position as a Lead. [Mr. Noble] and I are both Leads and because

we were both on the same level, I did not feel that it was appropriate that I keep records of his breaks, lunch, etc. I felt [Mr. Noble's] immediate supervisor should keep that data.

Id. at ¶ 12.

Mr. Noble cites to the following testimony of Sam Thompson, a Lead Transportation

Security Officer at the time of the 2008 events:

Yes, the green book is a notebook - I was not [Mr. Noble's] supervisor. We were equals. My immediate supervisor Ryan Davis told me to keep track of [Mr. Noble]. I kept track of him for 1½ months and at the end of that time, I had nothing to report. I would watch and see if he got to work on time/extended breaks/negative moral [sic] and according to what I saw, he did not do anything wrong. I never talked to any other managers about what they saw or heard. I did not talk to Kyle about this and I did not talk to Tony about this. I basically just told Ryan that I had nothing to report. Haymond Foreman was also keeping a green book on [Mr. Noble] but I did not talk to Haymond Foreman about it. I have no idea what Haymond reported. The time period I kept track of [Mr. Noble's] activities was approximately January to March of 2008.

Id. at Ex. 29, ¶¶ 4, 16.

Finally, Mr. Noble cites to the affidavit of co-worker Denise Rodriguez. *Response*, p. 19.

When asked what happened when Tom Brown talked to Mr. Noble about signing a legal slip

because he was away from his work station, Ms. Rodriguez replied:

Tom came up to him and he said something about John being gone a long time from the work area. Tom was wrong, John was in the work area and he had been talking to me and that is how I knew that he was in the work place. I did not get a chance to tell Tom that he was incorrect because John put his hand up and informed me that he would take care of it later.

Id. at Ex. 30, ¶ 14.

Ms. Rodriguez goes on to state "I was very upset!  I went and told Rudy Lazoya about it. Because Tom was not our regular supervisor and why did we have another supervisor come in and write up John."  Id. at ¶ 15.  She also states that Mr. Lopez "is probably the only lead that never raises his voice."  Id. at ¶ 18.[16]

Again, Mr. Noble does not cite to any evidence to show that the alleged actions were racially motivated or were taken in retaliation for previous EEOC activity.

Mr. Noble's fourth formal complaint of discrimination was filed on April 10, 2009.  Mr. Noble claimed he was subjected to race discrimination and retaliation for his prior EEO activity when on December 4, 2008, he was terminated from his position as Lead Transportation Security Officer.

In support of his termination claim, Mr. Noble cites to the affidavits of Mark Steven, Nathan Cochran, and Howard McCartney.  *Motion*, p. 22.

Mr. Noble does not specify which portion of Mr. Steven's affidavit he is relying on, nor does he provide a citation for it.  This deficiency notwithstanding, I have located the affidavit as Exhibit 42 to the Response.  Mr. Steven does not make any statements relating to retaliation as a motive for the plaintiff's termination.  As to race, Mr. Steven states "I don't see [Mr. Noble's] problem as racial in nature."  *Response*, Ex. 42, p. 3, ¶ 8.

Mr. Cochran "only knew [Mr. Noble] casually."  Id. at Ex. 40, ¶ 5.  Mr. Cochran states:

> I worked with [Mr. Noble] that day and was sitting in the same
> area.  I got up for baggage and understood Steve Lemcke,

---

[16]Mr. Noble also cites to affidavit testimony regarding a chair being thrown in the break room.  *Response*, p. 21.  Neither the Complaint nor the EEO complaints contain allegations of discriminatory behavior relating to the chair incident.  Therefore, I do not include the affidavit testimony in my analysis of the Motion.

> supervisor, said [Mr. Noble] was sleeping on the job. I knew [Mr. Noble] was drowsy. I found out a few days later that Steve Lemcke wrote [Mr. Noble] up. It was stated to me that Mr. Lemcke had watched [Mr. Noble] from his desk for ten minutes as he sat with his eyes closed. I don't believe Mr. Lemcke could see [Mr. Noble] from his desk. I believe that was not proper supervision and that some intervention was required. I was aware [Mr. Noble] had some problems with management and management's attempts to hold things against [Mr. Noble]. I was aware [Mr. Noble] had medical problems (migraine headaches) and had taken extensive sick days. [Mr. Noble] was under new medication. Management thought [Mr. Noble] used his sickness to take days off.

Id. at ¶ 6.

When asked if other employees slept on the job and if such employees received similar or

dissimilar treatment, Mr. Cochran stated:

> There have been occurrences where employees nod off or are drowsy during work hours. On example was Howard McCartney who, while on medication, may have taken the wrong dosage. Mr. McCartney was not in good physical condition and was under heavy medication. You could tell when he was having a bad day. I did not observe much else however. I know not everyone is treated equally or fairly. Management can look for ways to get rid of you.

Id. at ¶ 7.

Mr. McCartney was a Supervisory Transportation Security Officer. Id. at Ex. 42, ¶ 1.

Mr. McCartney stated:

> I am very aware of the poor management practices at TSA, Denver International Airport. Retaliation is an everyday thing at the Denver Airport. I was taking new medication that virtually knocked me out twice on the job. The first time I turned myself in and provided information from my doctor. Management did nothing to me and just wrote me a guidance letter suggesting that I try new medication the night before reporting for duty at the airport. A second time at the airport I had pneumonia and passed out. Management said I was sleeping again and did nothing.

Management just wrote a letter saying I just should be more aware. They actually wrote me up and allowed me to work three additional months before retiring me.  The problem is management should treat everyone equally and they don't.

In another instance, a supervisor caught an employee sleeping outside the check-point and did nothing to him . . . .

In [Mr. Noble's] case, he was terminated in retaliation for speaking up.  He had several EEO cases against various members of management and they didn't like that.  I couldn't see whether race was a factor with [Mr. Noble] however reprisal for his speaking up very definitely resulted in [Mr. Noble's] termination.

Managers at DIA are very busy building their own little empires. If you are told to do something illegal and you don't do it they'll go after you.  Management asked me to write up [Mr. Noble] for FMLA after they approved it.  I refused to do as they asked. Instead, management moved [Mr. Noble] so that he could be, and was, written up by another supervisor.

In the past, Santos (Tony) Savoia, a Screening Manager, had complaints filed against him by [Mr. Noble].  Mr. Savoia was known to harass people and has more EEO cases filed against him than anyone else at the airport.  Mr. Savoia had others write me up for sleeping rather than just checking to see how I felt.  He is known by the nickname of Prince of Darkness by airport staff on the floor.  There is even a newspaper article about the retaliatory practices of management at the airport . . . .

[Mr. Noble] was a great worker for me and never slept on the job. In this case, [he] submitted medical information about his medication only to have it rejected by management.  Somewhere Mr. Savoia was involved in trying to get [Mr. Noble] terminated. There was no way Mr. Lemcke could have seen [Mr. Noble] sleeping from his vantage point.  Management just pick and choose who they do it to.  In [Mr. Noble's] case he spoke up.  They don't want you to tell the truth, just tell them what they want to hear.

Id. at ¶ 5.

Mr. Noble does not cite to any evidence tending to show that he was terminated because

of his race.  Therefore, he has failed to establish a prima facie case of termination based on race.

38

The only evidence he cites regarding retaliation is Mr. McCartney's statement that "in [Mr. Noble's] case, he was terminated in retaliation for speaking up." This conclusory statement, without more, is not sufficient to create a material fact dispute regarding whether Mr. Noble was terminated in retaliation for engaging in protected EEO activity. Mr. Noble does not cite to any evidence to show who was responsible for terminating his employment; how or whether that individual knew or should have known of his previous EEO activity; or the nature of the activity that constituted protected EEO activity.

Moreover, Mr. Noble's last EEO complaint was filed May 22, 2008--more than six months prior to his termination. The Tenth Circuit has held that the temporal proximity of an adverse employment action to protected activity may support a showing of causation. Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999). A one and one-half month period between a protected activity and an adverse action may, by itself, establish causation. Id. However, a three-month period, standing alone, is insufficient. Id. The six month time-span between Mr. Noble's last EEO filing and his termination does not create an inference of causation without additional evidence linking his termination to protected EEO activity. Therefore, Mr. Noble has failed to establish a prima facie case of termination based on retaliation.

In summary, Mr. Noble alleges harsh and unfair treatment, but cites no evidence tending to show that the alleged actions stemmed from racial animus or retaliation for protected EEO activity. Accordingly, Mr. Noble has failed to set forth a prima facie case of discrimination based on race or retaliation, nor has he set forth sufficient evidence to show that he was subjected to a hostile work environment. The Motion should be granted insofar as it seeks

summary judgment in favor of the defendant on Mr. Noble's claims of hostile environment, race discrimination, and hostile environment.

## IV.   CONCLUSION

I respectfully RECOMMEND that the Motion be GRANTED and that summary judgment enter in favor of the defendant on all of the plaintiffs' claims.

FURTHER, IT IS ORDERED that pursuant to 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have 14 days after service of this recommendation to serve and file specific, written objections.  A party's failure to serve and file specific, written objections waives *de novo* review of the recommendation by the district judge, Fed.R.Civ.P. 72(b); Thomas v. Arn, 474 U.S. 140, 147-48 (1985), and also waives appellate review of both factual and legal questions.  In re Key Energy Resources Inc., 230 F.3d 1197, 1199-1200 (10th Cir. 2000).  A party's objections to this recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review.  United States v. One Parcel of Real Property, 73 F.3d 1057, 1060 (10th Cir. 1996).

Dated April 6, 2011.

                                                BY THE COURT:

                                                 s/ Boyd N. Boland
                                                United States Magistrate Judge